IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| INFORMATION SYSTEMS & <br> NETWORKS CORPORATION <br> 10411 Motor City Drive, Suite 700 <br> Bethesda, Maryland 20817 <br><br> Plaintiff <br><br> v. <br><br> JEFFERY HINES <br> 1150 Capital Drive <br> Argyle, TX 76226 <br><br>   Serve:  Jeffery Hines <br>       1150 Capital Drive <br>       Argyle, TX 76226 <br><br> Defendants | Case No. 8:25-cv-01597 |

## **COMPLAINT**

Plaintiff, INFORMATION SYSTEMS & NETWORKS CORPORATION ("Plaintiff" or "ISN"), in the above-entitled action, by and through its undersigned counsel, hereby demands judgment against Defendant, JEFFERY HINES ("Hines" or "Defendant"), in the amounts to be established at trial, and as its Complaint, hereby states as follows:

## **PARTIES**

1. Plaintiff, Information Systems & Networks Corporation, is a Maryland corporation, owned and operated under the laws of the state of Maryland, and has a principal place of business at 10401 Motor City Drive, Suite 700, Bethesda, Montgomery County, Maryland 20817. For purposes of subject-matter jurisdiction, Plaintiff is a citizen of Maryland, the state in which it is incorporated and the location of its principal place of business.

2. Upon information and belief, Defendant, Jeffery Hines, is an adult resident and citizen of the state of Texas, eighteen years of age or older, with a last known residential address and domicile at 1150 Capital Drive, Argyle, Texas 76226. For purposes of subject-matter jurisdiction, Hines is a citizen of Texas, the location of his domicile and permanent residence.

**JURISDICTION & VENUE**

3. This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and/or 1332, because this case raises questions of federal law and because there is complete diversity of citizenship among the parties and the matter in controversy exceeds the sum of $75,000.

4. This Court has personal jurisdiction over Hines under MD. CODE ANN., CTS. & JUD. PROC. §§ 6-103(b)(2) and 6-103(c)(2) because he entered into and breached a contract to provide services in the state of Maryland and because he misappropriated confidential information through a computer system or program for use in or out of the state of Maryland. In addition, the contract in question contains a choice of venue provision which requires litigation to take place in the state and federal courts in Maryland, and Hines consented and agreed to that provision.

5. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and/or (c) because a substantial part of the events or omissions giving rise to the underlying claims advanced herein occurred and/or because Defendant is subject to this Court's personal jurisdiction with respect to this action. In addition, Defendant entered into a contract, which is the subject of this action, which included a choice of venue provision which requires litigation to take place in the state and federal courts in Maryland, and Hines consented and agreed to that provision.

**FACTS COMMON TO ALL COUNTS**

6. ISN is a federal government contractor and leading provider of investigation and

inspection services primarily to federal agency customers. ISN operates in areas of compliance, real estate, financial management, and software development, among other sectors.

7. Among ISN's principal federal contracting engagements is an indefinite delivery, indefinite quantity ("IDIQ") contract with the United States Department of Agriculture ("USDA"), Rural Development, Servicing and Asset Management Office for Nationwide Default Management Services ("NDMS").

8. IDIQ contracts, including the NDMS IDIQ are generally awarded to multiple federal contractors.

9. A federal agency then awards task order contracts under the IDIQ, with competition or award or both restricted only to IDIQ contract holders.

10. Dawson's Realty & Mortgages, Inc., which does business as Dawson's Management & Consulting, Inc. and Dawson's Management ("Dawson's"), holds an NDMS IDIQ contract and is a direct competitor of ISN's.

11. ISN hired Hines as a Project Manager on March 22, 2023. His role at ISN was extensive, involving comprehensive oversight and responsibility for ISN's NDMS IDIQ contract, and task orders issued thereunder, including day-to-day management, direct communication and coordination with the USDA Program Office, invoicing, technical direction, and contract performance.

12. In that capacity, Hines had direct access to ISN's confidential and proprietary information and trade secrets, including, specifically, ISN's pricing structure and strategies for the NDMS IDIQ, its contacts with tailored vendors used on the NDMS IDIQ, and business development strategies for the NDMS IDIQ work.

13. ISN's pricing structure and strategies for the NDMS IDIQ, its contacts with vendors

specific to the NDMS program, and its business development strategies (collectively, "Confidential Information") are proprietary and competitively-sensitive information and trade secrets belonging to ISN which have independent economic value from not being generally known to and not being readily ascertainable through proper means by, a competitor.

14. Specifically, ISN's Confidential Information is what sets it apart in bidding on and obtaining work under the NDMS IDIQ. Its pricing structure and strategies are particularly sensitive, because often the defining characteristic that results in increased or decreased business under the NDMS IDIQ is the price proposed and offered by a contractor.

15. ISN has invested substantial time and resources in developing its Confidential Information/trade secrets. Specifically, ISN has invested substantial time, energy, and financial resources and has paid its employees to engage in substantial market research to develop critical vendor relationships to best perform the NDMS IDIQ work and to develop a pricing strategy that represents a strong win probability.

16. ISN has taken, and continues to take, reasonable measures to protect and preserve the secrecy and confidentiality of its trade secrets.

17. ISN utilizes non-disclosure and confidentiality agreements for its employees which prohibit employees from sharing ISN's Confidential Information and trade secrets with third-parties.

18. ISN protects its confidential and proprietary information and trade secrets by restricting access to such information only to those individuals with a need to know the information and only after those individuals have executed confidentiality agreements as a mandatory condition of those individuals' employment.

19. ISN also protects its Confidential Information and trade secrets by password-

protecting the information and/or housing it in restricted locations and providing such passwords and/or access only to those with a direct need to access such information for the good faith furtherance of ISN's business interests on the NDMS IDIQ.

20. ISN also implements appropriate cybersecurity protocols to prevent such information from being accessed by unauthorized sources.

21. Under Maryland law, Hines had a duty of loyalty to ISN to never use or disclose ISN's confidential information for any purpose except where it may be required in connection with his work for ISN. Hines held this duty during his employment with ISN and it survives his termination with ISN. *Id.*

22. On or about March 22, 2023, and as a condition of his employment, Hines signed a Non-Compete Agreement (the "Non-Compete Agreement") and Non-Disclosure Agreement with ISN. Exhibit A – Non-Compete Agreement; Exhibit B – Non-Disclosure Agreement. In an effort to protect against Hines's disclosure of ISN's Confidential Information, the Non-Compete Agreement contains the following provision at Section 8:

> Employee acknowledges that employment with Employer will, of necessity, provide employee with proprietary and confidential information and in that regard has executed ISN's standard Non-Disclosure Agreement ("the NDA") as a condition of employment. The following re-confirms and re-states the terms of the NDA whereby the Employee has agreed:
>
> a. To accept and retain all information in confidence.
> b. Not to use, publish or otherwise disclose to others, directly or indirectly, either during or after employment, except as may be necessary to the carrying out of Employee's duties for Employer, any proprietary or confidential information of Employer.
> c. To turn over to Employer all written or descriptive matter containing any proprietary or confidential information or data upon termination of Employee's employment or sooner at the request of the Employer.
> d. That all information, whether written or otherwise regarding Employer's business (i.e., information regarding customers, customer lists, costs, prices, earning[s], products, formulae, compositions, machines, apparatus, systems, procedures, prospective and executed contracts, other business

      arrangements and sources of supply) are presumed to be proprietary and confidential information of Employer for purposes of the Agreement and the NDA.

   e.  Not to disclose proprietary and confidential information for a period of (3) years after termination of employment with Employer and to hold trade secrets of ISN in confidence in perpetuity. Employee further acknowledges that he/she has not disclosed, nor will disclose or utilize any proprietary or confidential information during the term of employment with Employer.

Exhibit A ¶ 8.

    23.    As part of ISN's standard NDA, Hines agreed that his access to Confidential Information was granted solely to enable him to perform his obligations for ISN; that if there was any question as to whether information should be treated as Confidential Information, he was required to request clarification from ISN's Contract Compliance Officer; and that any disclosure of Confidential Information would violate his agreement with ISN, among other things. Exhibit B.

    24.    Hines's Non-Compete Agreement also included the following provision at Section 9:

> Employee acknowledges that employment with Employer will, of necessity, provide Employee with proprietary and confidential information, including but not limited to operations, products, technical solutions, services, trade secrets and marketing contracts of Employer. In addition, Employee acknowledges that their working on an ISN contract will provide the Employee confidential and proprietary information about that contract which if disclosed to an ISN competitor, would cause ISN irreparable harm in either performance of the contract or any re-compete for that contract. Accordingly, Employee agrees:
>    a.  During employment with Employer, Employee shall not engage in any business which sells goods or services similar to those sold by Employer without Employer's prior written [consent; such] outside activities of Employee include, but are not limited to, performing services for any other employer or personal operation or conducting a competitive business.
>    b.  During employment with Employer and for a period of one (1) year after termination of such employment, Employee shall not directly or indirectly (either as proprietor, partner, officer, agent, consultant, employee or otherwise) engage in any business which sells goods or services similar to those sold by Employer during Employee's employment regardless of the location of the competitive business. Such a prohibition takes into consideration the use of on-line stay-at-home

        resources and that any limited geographical limitation no longer is applicable under current circumstances for this prohibition.

   c.    During employment with Employer and for a period of one (1) year after termination of such employment, Employee shall not directly or indirectly (either as proprietor, partner, officer, agent, consultant, employee or otherwise) solicit Employers' clients for work the Employer had or was in the process of obtaining during employment or in the one (1) year preceding Employee's termination of employment, which includes assisting in any form a competitor of ISN in the procurement of a contract which ISN performed on during Employee's employment. [ ]

   e.    During employment with Employer and for a period of one (1) year after termination of such employment, Employee shall not directly or indirectly (either as proprietor, partner, officer, agent, consultant, employee or otherwise) engage in any outside business activity which includes the utilization of his knowledge of ISN's proprietary and/or confidential information. Employee shall not [use] trade secrets of Employer, learned in any way during employment with Employer unless approved [and] authorized by Employer in writing. [ ]

Exhibit A ¶ 9.

25. In reliance on Hines's execution of the Non-Compete Agreement and NDA, and by virtue of Hines's critical position within ISN relative to the NDMS IDIQ, Hines was granted access to ISN's confidential and proprietary information, including but not limited to ISN's non-public and competitively sensitive information, including ISN's strategic performance methodology, pricing approach, vendor agreements (including price), internal staffing models, subcontractor and vendor relationships, and its plans for expanding NDMS-related workshare.

26. As part of executing his job duties, Hines accessed ISN's confidential and proprietary information, including the above Confidential Information, regularly.

27. Hines resigned from ISN on June 28, 2024, effective July 12, 2024.

28. ISN later learned that Hines had begun working in concert with Dawson's—an ISN competitor and fellow NDMS IDIQ contract holder—in support of Dawson's contract, which is nearly identical in scope and services to ISN's.

29. Dawson's is a direct competitor of ISN in the federal contracting marketplace and specifically on the NDMS IDIQ.

30. Hines began working in concert with Dawson's, as either an employee or consultant, within the one-year restricted period in his Non-Compete Agreement.

31. The scope of services under Dawson's NDMS contract is materially identical to the services provided by ISN under its own NDMS contract and includes, without limitation, foreclosure services, real estate owned ("REO") asset management, property preservation, appraisal services, eviction coordination, and bankruptcy support. Dawson's and ISN compete for task orders under the NDMS contract to represent USDA's interests in various regions throughout the United States.

32. ISN has learned from federal government industry sources that Hines currently performs or assists in performing services for Dawson's that are materially indistinguishable from those he performed at ISN, including serving as a point of contact for Dawson's with the government.

33. Hines's new position with Dawson's places him in direct violation of his contractual obligations to ISN, and he has breached his NCA as a result.

34. In addition, Hines has shared ISN's Confidential Information with Dawson's in order to assist Dawson's in competing against ISN and obtaining additional work under the NDMS IDIQ contract.

35. For instance, on information and belief, Hines has provided ISN's vendor contacts, pricing information, and pricing strategies to Dawson's to assist Dawson's to more successfully compete against ISN.

36. Hines leveraged his knowledge of ISN's Confidential Information and trade secrets,

including subcontractor network, workshare percentages, pricing models, and business operations to facilitate the improper solicitation of ISN's vendor and subcontractor network, in further violation of his contractual commitments.

37. Since Hines left ISN and began working for Dawson's, Dawson's share of work on the NDMS IDIQ has substantially increased.

38. On August 14, 2024, ISN delivered a formal cease-and-desist letter to Hines, notifying him of the violations of his agreements and demanding that he (i) terminate his association with Dawson's, (ii) cease any further use or disclosure of ISN's confidential information, and (iii) affirm compliance with his Agreements. Hines did not comply. He did not deny the conduct, did not return any ISN property, and did not provide the assurances ISN requested.

39. Despite repeated requests from ISN, Hines refuses to cease his unlawful actions and, upon information and belief, continues to violate the terms and conditions of his Agreements.

40. Dawson's has realized this material increase in work under the NDMS IDIQ contract despite not otherwise having the business capabilities or relationships to justify such a significant increase, absent use of ISN's confidential and proprietary information and trade secrets.

41. On information and belief, Dawson's has received, and continues to benefit from, ISN's confidential and trade secret information, disclosed improperly and in breach of Hines's continuing obligations to ISN.

42. With Hines's assistance, and at his behest, Dawson's continues to use ISN's confidential and proprietary information and trade secrets to compete against ISN on the NDMS IDIQ contract.

43. Additionally, ISN has received credible reports that, following his engagement by

Dawson's, Hines solicited one or more ISN subcontractors and encouraged them to terminate or diminish their affiliation with ISN and transition to working with Dawson's instead.

44. ISN has a suffered damages as a direct and proximate result of Hines's breach of contract and misappropriation of ISN's trade secrets.

## CAUSES OF ACTION
## COUNT I – Breach of Contract

45. ISN incorporates by reference the allegations contained in paragraphs 1 through 44 of this Complaint as if fully set forth and restated herein.

46. On March 22, 2023, Hines entered into valid and enforceable Non-Disclosure Agreement and Non-Compete Agreements with ISN. Exhibit A, Exhibit B.

47. Under the terms of the Agreements, Hines expressly agreed, *inter alia*:

   a. That he would preserve the confidentiality of ISN's Confidential Information and trade secrets;

   b. That he would not use or otherwise disclose to others ISN's Confidential Information and trade secrets;

   c. That he would not engage in business directly competitive to ISN by performing the same work he performed at ISN for himself or for others;

   d. That he would not assist an ISN competitor in competing against ISN; and

   e. That he would not use any of ISN's Confidential Information or trade secrets in a manner competitive to ISN, among other things.

48. Hines's agreements and obligations thereunder constitute valid and legally enforceable contracts and obligations.

49. Hines's contractual obligations are reasonable in scope and no broader than necessary to protect ISN's legitimate business interests in, among other things, ensuring a stable

workforce, safeguarding confidential information, and protecting longstanding customer relationships and other goodwill of the Company.

50. With regard to the reasonableness of the restrictions in the non-compete, Hines worked remotely during his employment with ISN and the scope of his work was nationwide, and it is reasonable to restrict Hines from competing against ISN because he can do so, including specifically with regard to the NDMS contract, from anywhere in the United States.

51. ISN provided adequate and sufficient consideration to Hines in exchange for his commitment to fully comply with his contractual obligations to not compete with nor communicate any Confidential information to competitors, specifically his employment and compensation while employed by ISN.

52. But for his affiliation with ISN and his position of trust as ISN's Project Manager, Hines would not have had access to ISN's Confidential Information.

53. ISN has fully performed and fulfilled its obligations under the Non-Compete and Non-Disclosure Agreements.

54. Hines breached his agreements by, *inter alia*:

   a. Failing to preserve the confidentiality of, and otherwise sharing, ISN's Confidential Information and trade secrets with Dawson's;

   b. Providing services to Dawson's related directly to the same services and subject matter to his work for ISN;

   c. Engaging in business, for himself and for Dawson's, in a manner directly competitive to ISN, including by using ISN's Confidential Information and trade secrets on the NDMS IDIQ work to increase Dawson's share of the work;

   d. Assisting Dawson's to compete against ISN;

    e. Utilizing ISN's Confidential Information and trade secrets to solicit ISN's subcontractors and vendors and to encourage them to stop doing business with ISN; and

    f. Otherwise breaching the agreements.

55. As a direct and proximate result of Hines's breach of contract, ISN has suffered actual and consequential damages in an amount to be proven at trial.

## COUNT II – Misappropriation of Trade Secrets
## Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq*.

56. ISN incorporates by reference the allegations contained in paragraphs 1 through 44 of this Complaint as if fully set forth and restated herein.

57. During his employment, Hines had access to ISN's trade secrets, as defined by 18 U.S.C. § 1839(3), including but not limited to, proprietary methodologies for executing NDMS services; internal pricing models and cost structures; subcontractor sourcing and relationship strategies; vendor pricing and agreement terms; and strategic methodologies developed for contract performance and procurements.

58. The trade secrets and confidential information Hines obtained during his employment with ISN, as referenced in this Complaint, relate to products and services that are used in, and intended for use in, interstate or foreign commerce, within the meaning of 18 U.S.C. § 1839(b)(1).

59. ISN engages in efforts reasonable under the circumstances to protect the confidentiality of its trade secrets, including by entering into confidentiality agreements with its employees (including Hines), restricting access to Confidential Information and trade secrets to employees with a need to know such information, password-protecting and restricting access to such information, and implementing cybersecurity protocols to ensure the protection of the

information from outside sources.

60. ISN's trade secret information, including ISN's pricing structure and strategies for the NDMS IDIQ, its contacts and contracts with vendors specific to the NDMS program (including its pricing for those relationships), and its business development strategies, have independent economic value from not being generally known to and not being readily ascertainable through proper means by, a competitor (such as Dawson's).

61. Specifically, ISN's Confidential Information is what sets it apart in bidding on and obtaining work under the NDMS IDIQ. Its pricing structure and strategies are particularly sensitive, because often the defining characteristic that results in increased or decreased business under the NDMS IDIQ is the price proposed and offered by a contractor. Likewise, its pricing with vendors and subcontractors allows ISN to offer the most competitive price possible to the USDA on the NDMS IDIQ in order to maximize ISN's work under that contract.

62. ISN has invested substantial time and resources in developing its Confidential Information/trade secrets. Specifically, ISN has invested substantial time, energy, and financial resources and has engaged in substantial market research to develop critical vendor relationships to best perform the NDMS IDIQ work and to develop a pricing strategy that represents a strong win probability.

63. After leaving his employment with ISN, Hines shared ISN's trade secrets with Dawson's to assist Dawson's in competing against ISN, including by providing pricing information and details of ISN's vendor relationships and agreements.

64. Hines knew or had reason to know that the information he was sharing with Dawson's was ISN's trade secrets, but he provided the information anyway, without notifying ISN.

65. Additionally, Hines used ISN's trade secret information to give Dawson's a

competitive advantage by including these trade secrets in their performance of their own USDA NDMS contract.

66. Dawson's has used those trade secrets to increase the amount of work it receives under its NDMS IDIQ, to ISN's detriment.

67. At the time of his disclosure of ISN's trade secret information to Dawson's, Hines did not have ISN's express or implied consent to disclose the information, nor did ISN consent to Dawson's receiving the trade secret information at any time.

68. Hines acquired ISN's trade secrets under circumstances giving rise to a duty to maintain the secrecy of those trade secrets and/or owed a duty to maintain the secrecy of the trade secrets, as required under his agreements with ISN.

69. As a direct and proximate cause of Defendant's wrongful conduct, ISN has suffered direct and consequential damages and is entitled to compensatory damages under 18 U.S.C. § 1836, as well as enhanced damages in an amount to be proven at trial.

70. Additionally, Hines's disclosure has unjustly enriched Dawson's and himself, to the extent he has received increased is compensation and/or bonuses related to performance on the NDMS IDIQ for Dawson's and must disgorge any profits received as a result of the use of ISN's trade secrets.

71. Further, Defendant's conduct constitutes knowing, willful, and malicious misappropriation, and thus ISN is entitled to an award of punitive damages and attorneys' fees.

### COUNT III – Misappropriation of Trade Secrets: Maryland Uniform Trade Secrets Act, MD. CODE ANN., COM. LAW §§ 11-1201, *et seq.*

72. ISN incorporates by reference the allegations contained in paragraphs 1 through 44 of this Complaint as if fully set forth and restated herein.

73. During his employment, Hines had access to ISN's trade secrets, as defined by MD.

Code Ann., Com. Law § 11-1201, including but not limited to, proprietary methodologies for executing NDMS services; internal pricing models and cost structures; subcontractor sourcing and relationship strategies; vendor pricing and agreement terms; and strategic methodologies developed for contract performance and procurements.

74. The trade secrets and confidential information Hines obtained during his employment with ISN, as referenced in this Complaint, relate to products and services that are used in, and intended for use in, interstate or foreign commerce, within the meaning of Md. Code Ann., Com. Law § 11-1201.

75. ISN engages in efforts reasonable under the circumstances to protect the confidentiality of its trade secrets, including by entering into confidentiality agreements with its employees (including Hines), restricting access to Confidential Information and trade secrets to employees with a need to know such information, password-protecting and restricting access to such information, and implementing cybersecurity protocols to ensure the protection of the information from outside sources.

76. ISN's trade secret information, including ISN's pricing structure and strategies for the NDMS IDIQ, its contacts and contracts with vendors specific to the NDMS program (including its pricing for those relationships), and its business development strategies, have independent economic value from not being generally known to and not being readily ascertainable through proper means by, a competitor (such as Dawson's).

77. Specifically, ISN's Confidential Information is what sets it apart in bidding on and obtaining work under the NDMS IDIQ.  Its pricing structure and strategies are particularly sensitive, because often the defining characteristic that results in increased or decreased business under the NDMS IDIQ is the price proposed and offered by a contractor.  Likewise, its pricing

with vendors and subcontractors allows ISN to offer the most competitive price possible to the USDA on the NDMS IDIQ in order to maximize ISN's work under that contract.

78. ISN has invested substantial time and resources in developing its Confidential Information/trade secrets. Specifically, ISN has invested substantial time, energy, and financial resources and has engaged in substantial market research to develop critical vendor relationships to best perform the NDMS IDIQ work and to develop a pricing strategy that represents a strong win probability.

79. After leaving his employment with ISN, Hines shared ISN's trade secrets with Dawson's to assist Dawson's in competing against ISN, including by providing pricing information and details of ISN's vendor relationships and agreements.

80. Hines knew or had reason to know that the information he was sharing with Dawson's was ISN's trade secrets, but he provided the information anyway, without notifying ISN.

81. Additionally, Hines used ISN's trade secret information to give Dawson's a competitive advantage by including these trade secrets in their performance of their own USDA NDMS contract.

82. Dawson's has used those trade secrets to increase the amount of work it receives under its NDMS IDIQ, to ISN's detriment.

83. At the time of his disclosure of ISN's trade secret information to Dawson's, Hines did not have ISN's express or implied consent to disclose the information, nor did ISN consent to Dawson's receiving the trade secret information at any time.

84. Hines acquired ISN's trade secrets under circumstances giving rise to a duty to maintain the secrecy of those trade secrets and/or owed a duty to maintain the secrecy of the trade secrets, as required under his agreements with ISN.

85. As a direct and proximate cause of Defendant's wrongful conduct, ISN has suffered direct and consequential damages and is entitled to compensatory damages under MD. CODE ANN., COM. LAW §§ 11-1201, *et seq.*, as well as enhanced damages in an amount to be proven at trial.

86. Additionally, Hines's disclosure has unjustly enriched Dawson's and himself, to the extent he has received increased is compensation and/or bonuses related to performance on the NDMS IDIQ for Dawson's and must disgorge any profits received as a result of the use of ISN's trade secrets.

87. Further, Defendant's conduct constitutes knowing, willful, and malicious misappropriation, and thus ISN is entitled to an award of punitive damages and attorneys' fees.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff, Information Systems and Networks Corp., respectfully requests that this Honorable Court enter judgment in its favor and against Defendant, Jeffery Hines, including the following relief:

(a) Preliminary and permanent injunctive relief, upon the filing of a proper motion, enjoining Hines from working for Dawson's and any other direct ISN competitor on any NDMS contract or task order, from disclosing ISN's confidential and proprietary information and trade secrets to any ISN competitor;

(b) Monetary damages in an amount to be proven at trial, but in no event less than $8,000,000.00, plus pre- and post-judgment interest, attorneys' fees, costs, and punitive damages of no less than $8,000,000; and

(c) Such other and further relief as this Court deems appropriate under the circumstances.

**DEMAND FOR JURY TRIAL**

Plaintiff, Information Systems & Networks Corporation, in the above-entitled action, hereby demands a trial by jury on all claims raised in this case.

Dated: May 16, 2025  Respectfully submitted,

/s/ Matthew E. Feinberg
Matthew E. Feinberg (Bar No. 17745)
*mfeinberg@pilieromazza.com*
**PILIEROMAZZA PLLC**
1001 G Street, NW, Suite 1100
Washington, DC 20001
Tel: (202) 857-1000
Fax: (202) 857-0200

*Attorneys for Plaintiff, Information Systems & Networks Corporation*